UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

VICKI McCLENDON,                      )
                                      )
           Plaintiff,                 )
                                      )
      vs.                             )          Case No. 1:12CV124 CDP
                                      )
CAROLYN W. COLVIN,                    )
Acting Commissioner of Social Security, )
                                      )
           Defendant.                 )

## MEMORANDUM AND OPINION

This is an action under 42 U.S.C. § 405(g) for judicial review of the

Commissioner's final decision denying Vicki McClendon's application for

disability insurance benefits under Title II of the Social Security Act.  42 U.S.C. §§

401 *et seq.*  McClendon claims she is disabled because she suffers from a

combination of impairments, including bipolar disorder, depression, generalized

anxiety disorder, and atrial fibrillation.  After a hearing, the Administrative Law

Judge concluded that none of McClendon's impairments was severe.  Because I

find that the ALJ's decision was based on substantial evidence on the record as a

whole, I affirm.

## I.    Procedural History

McClendon filed her application for disability insurance benefits on March

20, 2009, alleging a disability onset date of April 30, 2006.  When her application

was denied, she requested a hearing before an administrative law judge.  She then appeared, with counsel, at an administrative hearing on September 21, 2010.  McClendon and her husband both testified at the hearing.  A vocational expert was present but did not testify.

After the hearing, the ALJ denied McClendon's application, and she appealed to the Appeals Council.  On June 18, 2012, the Council denied her request for review.  The ALJ's decision thereby became the final decision of the Commissioner.  *Van Vickle v. Astrue*, 539 F.3d 825, 828 (8th Cir. 2008).

McClendon now appeals to this court.  She argues that the ALJ erred by finding that her mental impairments were non-severe.

## II.    <u>Evidence Before the Administrative Law Judge</u>

The parties agree that this appeal relates only to the period between April 30, 2006, the date McClendon alleges her disability began, and December 31, 2007, the date she was last insured.  I have summarized evidence outside of that period because it may be material in determining the severity of alleged impairments during that period.  *See infra* for further discussion; *see also Pyland v. Apfel*, 149 F.3d 873, 877 (8th Cir. 1998) ("Evidence of a disability subsequent to the expiration of one's insured status can be relevant . . . in helping to elucidate a medical condition during the time for which benefits might be rewarded.").

– 2 –

However, I have not included evidence relating only to McClendon's physical impairments because they are not at issue on this appeal.

### *Medical Records Before Alleged Onset Date*

While traveling with friends on a motorcycle trip in 2003, McClendon witnessed her friends – who were on a motorcycle directly in front of her – be struck by a vehicle and be severely injured.  Afterward, on April 13, 2003, she began counseling with licensed clinical social worker Barbara Morgan.  According to an intake record from Morgan, McClendon discussed a history of abusive relationships and sought "emotional stabilization."  Morgan assigned McClendon a GAF of 58 and noted that her highest GAF in the past year had been 65.

McClendon also began seeing psychiatrist Robert McCool in 2003 and regularly saw her primary care physician Robert Dodson.  According to treatment records, McClendon had appointments with Dr. McCool about once per month and with Dr. Dodson every few months.

McClendon saw Dr. Dodson on May 13, 2005.  Dr. Dodson's notes indicate that McClendon was the primary caregiver for her mother, who was suffering from Alzheimer's disease.  He wrote that McClendon reported "some exacerbation with her depression" and noted that her mood was mildly elevated.  He also noted that McClendon was experiencing paresthesias, which he thought was likely due to Topamax prescribed by Dr. McCool.

– 3 –

On August 24, 2005, Dr. McCool diagnosed McClendon with bipolar disorder and generalized anxiety.  He prescribed Wellbutrin, Klonopin, and Topamax.  Although his note indicates that he was increasing the amount of Topamax prescribed, this is the earliest clinical note from Dr. McCool that is part of the record.  According to his notes, Dr. McCool's diagnoses remain the same throughout McClendon's treatment.  Dr. Dodson additionally diagnosed McClendon with major depression with atypical features.

At visits with both doctors throughout 2005, McClendon complained of social stressors, including frequent and intense conflict with her husband, daughter, and mother.  From time to time, she indicated that she and her husband were attempting to resolve their issues.  She also reported fatigue, insomnia, and headaches, which Dr. Dodson attributed to depression and mood disorder.  Both Dr. Dodson and Dr. McCool noted that McClendon was "tearful" at certain appointments.  Dr. Dodson wrote that McClendon's affect was "somewhat flat" at a visit on December 19, 2005.

Dr. Dodson repeated this characterization of McClendon's affect at a visit on February 28, 2006.  He wrote:

> At our last visit, the patient had a number of complaints, most concerning was intermittent chest pains. These seem to be associated with numerous social stressors. The patient had vacation and spent one month in Florida with her husband. This seemed to greatly reduce the stress, especially over the first few weeks. She has not had any of the chest pain symptoms since that time. She remains on a

– 4 –

combination of Wellbutrin and Topamax under the care of Dr.
McCool. She had increased the Topamax to 125 mg twice daily, but
developed significant paresthesias at the higher dose. She is currently
on 100 mg twice daily.

(Tr., p. 266.)

### *Medical Records During Period of Alleged Disability*

On March 21, 2006 – a month before McClendon's alleged onset of

disability – she saw Dr. McCool.  He continued to prescribe the same medications

(Topamax, Wellbutrin, and Klonopin), but noted that McClendon "report[ed]

improvement."  According to his notes, McClendon had "tension still with husband

but intensity [was] not as severe."  (Tr., p. 403.)

Though counselor Morgan and psychiatrist McCool both report seeing

McClendon regularly from 2003 on, there is no record of McClendon visiting any

health care provider from March until August 2006.  On August 22, 2006,

McClendon had a routine appointment with Dr. Dodson, who noted that she

continued to see Dr. McCool on a regular basis and continued to care for her

mother.

At two appointments with Dr. Dodson in October 2006, McClendon

complains of shoulder pain.  There is no record of any discussion of her mental

impairments at those appointments.

McClendon saw Dr. Dodson again on December 7, 2006.  Dr. Dodson wrote

that McClendon had "baseline affect" and good insight.  According to his notes on

McClendon's irritable bowel syndrome, McClendon reported "an exacerbation of her symptoms with stress such as that which occurs with the holidays." (Tr., p. 263.) Dr. Dodson diagnosed major depression once again and noted that McClendon remained under the care of Dr. McCool.

At a visit with Dr. McCool on December 14, 2006, McClendon reported feeling "anxious and overwhelmed." Because of her shoulder injury, she was not able to type. Dr. McCool repeated his assessment of bipolar disorder and generalized anxiety and switched McClendon from Klonopin to Valium.

The following month, on January 16, 2007, McClendon saw both doctors. She switched back to Klonopin after reporting problems with Valium's side effects. According to notes from Dr. McCool, McClendon reported some anxiety attacks and "still has some conflicts with husband but states both of them are making efforts to improve this relationship." (Tr., p. 401.)

Over the next couple of months, McClendon saw both doctors again. She reported difficulties sleeping and interpersonal problems with her mother, daughter, and husband. Though Dr. McCool noted that McClendon was receiving "much support from therapy sessions" with Morgan, clinical notes from those sessions are not part of the record.

On May 1, 2007, McClendon saw Dr. McCool and reported that her brother had died. Dr. McCool wrote that McClendon's mood was depressed and that she

"want[ed] a change of medication as she feels she was depressed even prior to his death."  McClendon reported that she had a limited support system and no close friends.  Dr. McCool switched her to Cymbalta, discontinuing Wellbutrin.  At a visit the following month, Dr. McCool wrote that McClendon reported nausea with the Cymbalta, so he decreased her prescription.  He wrote that the visit focused mostly on McClendon's husband and her unhappiness with his behavior.

On June 4, 2007, Dr. Dodson recorded McClendon's many complaints about physical symptoms but the record not does indicate any complaint about mental symptoms.  Dr. Dodson wrote that McClendon had "normal mood and affect."

On July 12, 2007, McClendon saw Dr. McCool, who wrote:

> Has remained fairly stable. No SI. Nausea resolved. Sleep/appetite stable. Sees therapist only every two weeks now.

(Tr., p. 306.)  At monthly visits for the rest of 2007, Dr. McCool continued to diagnose McClendon with generalized anxiety and bipolar disorder.  Her mood varied during these appointments.  In September and October, Dr. McCool reported that McClendon's mood was "depressed."  In October, she reported problems with her husband and daughter, anxiety, crying spells, nausea, and passive thoughts of death.  At a visit on November 28, 2007, he wrote that McClendon's mood and affect were "stable" and that she "still ha[d] issues with husband but [was] adjusting to them better."  (Tr., p. 302.)

– 7 –

## *Medical Records After Period of Alleged Disability*

The record contains no treatment notes between November 2007 and February 2008.  In late February, McClendon saw Dr. McCool and reported numerous conflicts with her husband.  Dr. McCool noted that McClendon continued to see counselor Morgan.  According to the record, McClendon saw Dr. McCool only three more times in 2008.  At a visit on October 27, 2008, Dr. McCool reported that McClendon's mood and affect were "euthymic," and that she had no insomnia symptoms and was "generally doing well."  (Tr., p. 297.)

Likewise, McClendon also continued to see Dr. Dodson in 2008.  The record shows three visits.  At a visit on March 18, 2008, Dr. Dodson wrote that McClendon was concerned about the cost of her medications and was planning to discuss with Dr. McCool the possibility of discontinuing them.  By September 16, 2008, Dr. Dodson wrote that McClendon had indeed stopped taking Wellbutrin and Topamax.  McClendon's mother had moved to a nursing home, which removed "a large amount of stress" from McClendon.  Dr. Dodson reported that McClendon was "very pleased with her mood."  (Tr., p. 257.)  However, at a visit on December 1, 2008, Dr. Dodson reported that McClendon had a flat affect and was tearful while discussing her stressors.

Later that month, McClendon had an episode of atrial fibrillation.  At a visit on March 10, 2009, Dr. Dodson reported that the fibrillation episode had "exacerbated her depression."

The record contains notes from at least 20 counseling appointments with therapist Barbara Morgan in 2009, plus continued visits to Dr. McCool and Dr. Dodson in 2009 and 2010.  At some visits, McClendon stated that she was doing well and exhibited eurythmic mood, but she frequently reported feeling depressed, anxious, and upset; continuing, intense conflict with her husband; chronic sleep problems; activity aversion; and panic attacks.  However, at a visit on November 5, 2009, Dr. McCool wrote that McClendon had "some improvement in mood" and that she reported her husband had been more supportive of her.  He noted "less mood lability."  (Tr., p. 381.)

Later that month, on November 18, 2009, cardiologist Gabriel Soto confirmed that McClendon reported that:

> since her cardioversion at the end of September she has been doing very well with improvement in both her energy level and overall mood.

(Tr., p. 365.)

### *Medical Source Statements*

Dr. McCool completed a medical source statement on September 11, 2009, almost two years after her insured period ended.  He marked boxes indicating that

– 9 –

McClendon was limited in her ability to handle work stress, get along with others, function cooperatively, focus, and organize; that she suffered from hypomanic, depressive, and mixed episodes; that he would expect recurrences even with treatment; and that McClendon's impairments would cause her to be absent from work more than three times per month.  He wrote that her ongoing interpersonal conflicts with husband, panic attacks, lability of affect, and "excessive worry/ruminations" could exacerbate her condition and further restrict her in a work environment.  (Tr., p. 358.)

In 2010, Dr. McCool wrote that he continued to concur with the source statement he had completed the year before.  He also repeated his concerns in a separate letter, writing that McClendon:

> has symptoms consistent with bipolar affective disorder type II, generalized anxiety disorder and sequelae of post traumatic stress disorder. Her symptoms have included depression, lability of affect, frequent interpersonal conflicts, panic attacks and free floating anxiety, impaired concentration and memory, intermittent insomnia, fatigue and anhedonia.

> When she first began treatment she was self employed as a medical trascriptionist from her home. In review of my clinical notes I am unable to ascertain when she stopped working in that capacity. Currently she is not able to sustain employment and would likely decompensate further if she attempted to be employed.

(Tr., p. 409.)  He clarified in a separate letter in March 2012 that McClendon had

been experiencing many of the same symptoms during the alleged disability period

and "would have had difficulty sustaining employment" at that time.[1]

In a letter dated April 23, 2009, counselor Morgan wrote that she had been

seeing McClendon since 2003.  Over time, their sessions had decreased in

frequency.  Morgan wrote that "[r]elational difficulties have been the focus of our

work."  According to Morgan, McClendon "readily perceives slights, rejections

and manipulations, and responds with intense anger and/or hurt, followed by

obsessive ruminations."  McClendon had often identified benefits from the use of

psychotropic medications.  Morgan wrote that McClendon had worked as a

medical transcriptionist throughout their time together, "with some variance in

quantity and quality of work production," but she did not believe there had been a

time when McClendon was not generating any income.  Morgan reported that

McClendon's abilities to focus, concentrate, and retain new data were sometimes

affected by her depression and anxiety.  Morgan saw no evidence of hallucinations,

delusional thinking, suicidal gestures, or lapses in personal hygiene.  She wrote

that McClendon had recently reported a decline in emotional functioning, which

---

[1]  This letter was not before the ALJ but was submitted to the Appeals Council as additional evidence. *See* 20 C.F.R. §404.970(b) (Council will consider new, material evidence if it relates to the period before the ALJ's decision).

McClendon primarily attributed to her cardiovascular symptoms and treatment beginning on November 27, 2008.

### *Psychiatric Review Technique*

A psychiatric review technique was completed May 26, 2009, by James Spence, PhD.  Spence found that there was insufficient evidence to determine whether McClendon's medically determinable impairments of major depression and generalized anxiety caused any functional limitations.  He found no evidence of repeated episodes of decompensation.

### *Function Report*

On April 24, 2009, McClendon completed a function report.  She wrote that her daily routine varied depending on how she felt.  When she was going through a depressive period, she felt "reclusive, troubled, anxious" and she spent "most days lying down sleeping off and on."  When not depressed, McClendon tried "to lead as normal life as possible."  On a normal day, she would wake up for breakfast but then "slip away into one of [her] half awake/half asleep" states.

Though McClendon reported a lot of anxiety, she would do normal daily tasks like eating, grooming, spending time with her husband and daughter, and watching television.  She would heat leftovers or frozen dinners, but had no patience for recipes.  Though she would try to read, she would "lose interest fast or

fall asleep." McClendon reported getting lost in her thoughts and forgetting what was going on around her.

McClendon also wrote that she used to do many things before her illness that she could no longer do, including helping with housework and pets, working in public, socializing with friends and family, and supporting herself financially. She reported having trouble falling asleep and staying asleep at night but also sleeping excessively during the day. Her Toprol prescription made her sleepy, and she felt tired "all of the time."

McClendon reported that she had arrived at appointments on the wrong date and had missed appointments altogether, so she needed reminders. She also reported that her husband would organize her medications and ensure McClendon took the right pills.

McClendon wrote that she would become short of breath while doing housework because of atrial fibrillation. She wrote that it "took over two hours to clean bathroom prior to Thanksgiving" and she "became very ill." She needed help and encouragement to do housework and could not do tasks that required bending, kneeling, or a lot of energy. Housework caused McClendon "physical distress and anxiety."

Going outdoors also made McClendon uncomfortable and she would only do so about once per week. She reported that, once per week, she accompanied her

husband to the grocery store and went out to eat with him.  Her husband did any

other shopping because she experienced panic attacks at stores like Walmart.

Although she stated she could go out alone, she had not done so in more than six

months, since November 2008.  Similarly, she had only driven twice since

November 2008 "due to fears."

McClendon reported that she could pay bills, use a checkbook, and count

change.  However, she was no longer interested in activities she used to like, such

as playing computer games.  She wrote that she did not participate in any social

events and had regular conflicts with her husband and daughter.

In addition to her physical impairments, McClendon reported difficulties

with remembering, completing tasks, concentrating, following instructions, and

getting along with others.  She could pay attention for 15 minutes at a time, but

could not follow written or spoken instructions very well.  McClendon wrote that

stress was one of her "worst enemies," and that she was "always afraid something

bad [was] going to happen."  She frequently felt worried and guilty.

In the "Remarks" section, McClendon wrote:

> Since getting sick in November with [atrial fibrillation] I still have
> problems with shortness of breath but have been told to take the pills
> & I will be OK.  I am tired all of the time.  It causes me worry &
> anxiety or panic making me believe there is really something wrong
> with my  heart.  Sometimes I would rather die than be worried about
> all of it.

(Tr., p. 208.)

– 14 –

### _Testimony at the September 21, 2010 Hearing_[2]

McClendon and her husband testified at the hearing before the ALJ.

McClendon testified that she was 58 years old and had a high school education,

plus some additional training.  She had last worked as a self-employed medical

transcriptionist out of her home.  McClendon stated that before that, she worked

for three months at a doctor's office recording electronic data.  She left because a

co-worker "was always screaming at [McClendon] when there was no one else

around."  McClendon testified that she could not deal with that situation.  She also

stated that she had worked at and then quit two jobs as a paralegal before doing

transcription work.

McClendon testified that on April 30, 2006, the alleged onset date, she "had

a breakdown."  She stated that she could not remember to take her medications;

that a family friend cared for her while her husband cared for his terminally ill

mother; and that she found out her younger brother needed a heart transplant.

McClendon stated that it had messed her up when her brother later died in surgery.

The ALJ asked McClendon if she had ever been hospitalized for emotional

problems.  She responded, "I could have, but I didn't," and that she would just

work things out at home and "just go to bed."  She stated that she had been on

"numerous antidepressants," including Klonopin.  Sometimes she would not take

---

[2]  I have only summarized the testimony relevant to the severity of McClendon's mental
impairments.

– 15 –

Klonopin because it would cause her to shake inside; instead, she would take Valium because it was the only thing that would stop the shaking.  But she stated that she tried not to take it every day.  The ALJ also asked if there were any treatments Dr. McCool had suggested that she had not been able to try because of financial reasons.  McClendon responded:

> No. We have talked about like the electric shock or something like that.  And we've just talked about it.  We haven't really proceeded with it, because – I don't know why.

(Tr., p. 41.)

McClendon reported that she had a problem sleeping at night and that her medications made her very drowsy during the day.  She stated that when her daughter came to live with her in 2005, she was "worried sick all the time" because her daughter would stay out late.  McClendon testified that most days, she would stay in her pajamas.  She stated that she took naps every day, and before 2008, they lasted about two hours.

McClendon also testified that she had panic attacks and crying spells.  Before she had stopped doing medical transcription work at home, she had panic attacks "basically whenever there was a patient that was my age and she had terminal cancer or something like that."  She would also have panic attacks when she and her husband would go out to where there were a lot of people.  She "would

just go from being fine to screaming." This occurred even though she took

psychotropic medications; sometimes, however, she did not take her medications.

McClendon stated that she would spend a lot of time just staring at the

computer when she was working because "the letters would start spreading and

going apart." According to McClendon, she could stay on task for less than 30

minutes at a time.

McClendon testified as to why she waited until 2009 to file her claim for

Social Security benefits:

> [M]y doctor's expenses and hospital expenses were becoming to a
> point that we couldn't pay them. And I went in to an appointment
> with Dr. McCool, and I told him I was going to have to go out and get
> a job. And he told me that that was not an option for me. And he told
> me that I needed to apply for Disability.

(Tr., p. 50.)

Charles McClendon also testified that his wife was "totally dependent" on

him for reminders about medications and appointments. He stated that it was the

fall of 2005 that McClendon's symptoms got much worse and her driving

"practically ceased." Charles McClendon stated that his wife spent most of the day

reclining, watching television, and taking naps; though he encouraged her to go

outside, she was basically "housebound" and "borderline agoraphobic."

He also testified that she could communicate with friends "fairly well" and

that her emotional episodes, including crying and yelling, mostly happened at

– 17 –

home, three or four times per week.  Charles McClendon stated that he did all the
household chores.  He and his wife had agreed that she would not use the stove
after she put a pot of water on and forgot about it.

The ALJ asked Charles McClendon why his wife continued to see the same
providers if she was not getting any better.  He stated that though he had asked her
if she wished to seek out someone else, she liked her providers and felt they were
helpful.  Vicki McClendon stated that their insurance plan only covered psychiatric
care at the facility she visited.

### III.   Standard for Determining Disability Under the Social Security Act

Social security regulations define disability as the inability to engage in any
substantial gainful activity by reason of any medically determinable physical or
mental impairment which can be expected to result in death or which has lasted or
can be expected to last for a continuous period of not less than twelve months.  42
U.S.C. § 416(i)(1); 20 C.F.R. § 404.1505(a); 20 C.F.R. § 416.905(a).

Determining whether a claimant is disabled requires the Commissioner to
evaluate the claim based on a five-step procedure.  20 C.F.R. § 404.1520(a),
416.920(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011)
(discussing the five-step process).

At the first step, the Commissioner must decide whether the claimant is engaging in substantial gainful activity. If so, she is not disabled. *See McCoy*, 648 F.3d at 611.

At the second step, which is at issue in this case, the Commissioner must determine if the claimant has a severe impairment (or combination of impairments) that "significantly limits her physical or mental ability to do basic work activities." *See* 20 C.F.R. § 404.1520(c), 404.1521(a), 415.920(c), 416.921(a); *see also* Social Security Ruling (SSR) 96–3p. "Basic work activities" include, among other things, understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers, and unusual work situations; and dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b).

The severity of the claimant's impairment is determined without regard to her age, education, or work experience. 20 C.F.R. § 404.1520(c); *Brown v. Barnhart*, 390 F.3d 535, 538 (8th Cir. 2004). If the impairment is not severe, the sequential evaluation process ends and the claimant is found not disabled. 20 C.F.R. §§ 404.1520, 416.920; *see also Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007).

The Commissioner has supplemented the familiar five-step sequential process for evaluating a claimant's eligibility for benefits with additional

regulations dealing specifically with mental impairments.  20 C.F.R. § 404.1520a.

As relevant here, the procedure requires an ALJ to determine the degree of

functional loss resulting from a mental impairment.  The ALJ considers loss of

function to four capacities deemed essential to work.  20 C.F.R. § 404.1520a(c)(2).

These capacities are: (1) activities of daily living; (2) social functioning; (3)

concentration, persistence or pace; and (4) deterioration or decompensation in

work or work-like settings.  20 C.F.R. § 404.1520a(c)(3).

After considering these areas of function, the ALJ rates limitations in the

first three areas as either: none; mild; moderate; marked; or extreme.  The degree

of limitation in regard to episodes of decompensation is determined by application

of a four-point scale: none; one or two; three; or four or more.  *See* 20 C.F.R. §

404.1520a(c)(4). When the degree of limitation in the first three functional areas is

"none" or "mild" with no limitations in the area of decompensation, mental

impairments are not considered severe, "unless the evidence otherwise indicates

that there is more than a minimal limitation in [a claimant's] ability to do basic

work activities."  20 C.F.R. § 404.1520a(d)(1); *see also Buckner v. Astrue*, 646

F.3d 549, 556 (8th Cir. 2011).

## IV.    <u>The ALJ's Decision</u>

Applying the five-step sequential evaluation, the ALJ first determined that

McClendon had not engaged in substantial gainful activity since April 30, 2006,

the date she alleged as the onset of her disability.  However, the ALJ found that McClendon met the special earnings requirements of the Social Security Act only through December 31, 2007.[3]

Proceeding to step two, the ALJ considered whether McClendon's mental impairments limited her ability to function in the four areas considered under Social Security regulations.  In reviewing the evidence related to McClendon's mental impairments, the ALJ noted that McClendon was not hospitalized during the alleged disability period; experienced no significant side effects from her medications; and had not sought more extreme treatment during that time.  Though McClendon mentioned discussing electroshock therapy with Dr. McCool, her husband testified that he was not aware of that discussion.  The ALJ found her testimony as to why she had not sought other treatment not credible.

The ALJ wrote that evidence of McClendon's mental impairments before 2008 showed her to be "pretty stable."  He noted that he did not doubt that she had bipolar disorder and generalized anxiety, or that she experienced symptoms like "panic attacks, crying spells, concentration lapses, insomnia, interpersonal conflicts, or other kinds of mental upsets."  But he wrote that "what he [did] not believe is that her mental illness developed into a syndrome that became some kind of daily, uncontrollable way of life for the claimant beginning in April 2006 or

_____

[3]  McClendon has not appealed this finding.

– 21 –

earlier." (Tr., p. 24.)  He found that "the preponderance of the documented

treatment records from Dr. McCool and Ms. Morgan do not show that."

The ALJ discounted the testimony by McClendon and her husband, pointing

out that Charles McClendon was not an expert; had a financial interest in the

outcome of the case; and "most important, his testimony, like [McClendon's], was

inconsistent with the preponderance of the opinions and observations by qualified

medical personnel in this case." (Tr., p. 25.)

Finally, the ALJ concluded that McClendon's mental impairments caused,

"at worst, only mild restrictions" of her activities of daily living; social

functioning; and concentration, persistence, and pace.  He also concluded that there

"were no recorded episodes of decompensation resulting in a loss of adaptive

functioning." (Tr., p. 25.)  Therefore, he found that none of McClendon's mental

impairments – including bipolar disorder, general affective disorder, and

depression – was severe.  As such, he concluded that McClendon was not disabled,

as that term is defined in the Act.

## V.    <u>Standard of Review</u>

This court's role on review is to determine whether the Commissioner's

decision is supported by substantial evidence on the record as a whole.  *Rucker v.*

*Apfel*, 141 F.3d 1256, 1259 (8th Cir. 1998).  "Substantial evidence" is less than a

preponderance but enough for a reasonable mind to find adequate support for the

ALJ's conclusion.  *Id.*  When substantial evidence exists to support the Commissioner's decision, a court may not reverse simply because evidence also supports a contrary conclusion, *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005), or because the court would have weighed the evidence differently. *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992).

To determine whether substantial evidence supports the decision, the court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the education, background, work history, and age of the claimant; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints relating to exertional and nonexertional impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts, when required, that is based upon a proper hypothetical question.  *Stewart v. Sec'y of Health & Human Servs.*, 957 F.2d 581, 585–86 (8th Cir. 1992).

## VI.   <u>Discussion</u>

McClendon argues that the ALJ's finding that her mental impairments were non-severe is not supported by substantial evidence.  She contends that her testimony, the testimony of her husband, and treatment records from her mental health providers, when taken together, prove that she suffered from severe mental impairments.

The burden of proving the severity of an impairment is on the claimant. *Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007). The standard for proof of a severe impairment is low, but it is not meaningless. *See id.* ("[s]everity is not an onerous requirement for a claimant to meet" but it is not "toothless"). An impairment will be deemed non-severe "if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Id.* at 707.

### *Extended Period of No Treatment*

Considering the record as a whole, I conclude that there is substantial evidence to support the ALJ's finding that McClendon's mental impairments were not severe during the alleged disability period. From the alleged onset date (April 30, 2006) to December 7, 2006, a period of more than seven months, there is no record of McClendon seeking any care for her mental impairments, though she had two appointments with Dr. Dodson in October for her shoulder pain. *See Gwathney v. Chater*, 104 F.3d 1043, 1045 (8th Cir. 1997) (failure to seek medical care was inconsistent with claimant's contention that she was disabled); *Hughes v. Astrue*, 4:07CV40, 2008 WL 621078, at *6 (E.D. Ark. Mar. 3, 2008) (where there were gaps of six and eight months between claimant's attempts to seek medical care for his conditions, ALJ was permitted to discount claimant's complaints of disabling pain). Though McClendon may have continued to take medications for

– 24 –

her mental conditions during that time, an impairment controlled by medication "is not considered disabling." *Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002).

### ***Treating Physician Called McClendon's Impairments "Stable"***

According to treatment records from Dr. McCool, McClendon reported anxiety and interpersonal conflicts during the first half of 2007. These conflicts generally arose between McClendon and her husband. Situational stressors, such as conflict in a particular relationship, do not necessarily show that a mental impairment has created significant functional limitations. *Dunahoo v. Apfel*, 241 F.3d 1033, 1039–40 (8th Cir. 2001); *see also Schaffer v. Astrue*, 2010 WL 1438802, 09CV3229, at *4 (W.D. Mo. Apr. 12, 2010) (claimant's conflicts with husband and daughter were situational stressors and did not support claimant's contention that her mental impairments were disabling). Even if they did, Dr. McCool noted by July 2007 that McClendon's mood, appetite, and sleep were "stable." Similarly, treatment records from Dr. Dodson indicate that McClendon's affect was "baseline" and "normal" around the same time. These clinical findings are not consistent with McClendon's contention that her mental impairments were disabling throughout the alleged disability period. *See Trenary v. Brown*, 898 F.2d 1361, 1364 (8th Cir. 1990) (stating that depression "is not necessarily disabling" and finding ALJ had not erred in concluding that claimant had not suffered from

severe depression doing relevant time period regardless of two doctors' findings that she had been depressed at various times).

In March 2012, more than four years after the claimants last inured date, Dr. McCool wrote that McClendon "would have had difficulty sustaining employment" during that time, but this conclusion is not consistent with his own clinical records during that period and could have been properly disregarded by the Appeals Council.[4]  *See Renstrom v. Astrue*, 680 F.3d 1057, 1064 (8th Cir. 2012) (Commissioner may discount opinion of treating physician who "renders inconsistent opinions that undermine the credibility of such opinions"); *see also Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005) (treating physician's conclusion that claimant is unable to work is not entitled to controlling weight because that determination is "assigned solely to the discretion of the Commissioner"); *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004) (Commissioner may appropriately disregard "vague, conclusory statements" by treating physician).

---

[4]   The fact that the letter was submitted to the Appeals Council but not to the ALJ does not change this court's standard of review.  *See Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007) ("Where, as here, the Appeals Council considers new evidence but denies review, we must determine whether the ALJ's decision was supported by substantial evidence on the record as a whole, including the new evidence.").

### *Other Sources Do Not Support Finding that Mental Impairments Were Severe*

Further, counselor Morgan's letter from April 2009 does not support a finding that McClendon's mental impairments were severe.[5]  Morgan wrote that McClendon's focus, concentration, and retention were "at times" affected by her impairments, but "there does not seem to have been an extended period of no income generating activity."  After describing McClendon's past marriages, which were abusive, Morgan reported that McClendon's current relationships were "relatively less conflictual, less distressing than in the past."

Though testimony by McClendon and her husband – for the most part – tends to support a finding that her mental impairments were severe, the ALJ was entitled to find that neither was credible.  *See Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (if adequately explained and supported, credibility findings are for ALJ to make); *see also Hinton v. Astrue*, 2013 WL 500836, 2:11CV85 JAR, at *19–*20 (E.D. Mo. Feb. 11, 2013) (where claimant's treatment for depression was not continuous, no provider imposed any functional restrictions on claimant, and claimant worked part-time during alleged disability period, ALJ did not err in finding claimant's allegations of disabling depression not credible).

### *Evidence of Later Disability Not Relevant*

---

[5]  Counselor Morgan does not appear to have been writing specificaly about the alleged disability period, but rather, about McClendon's mental states throughout their therapy relationship.

The Eighth Circuit has held that evidence of a disability after an alleged disability period can be relevant "in helping to elucidate a medical condition during the time for which benefits might be rewarded." *Pyland*, 149 F.3d at 877. Here, however, McClendon's treating psychiatrist described her impairments as "stable" toward the end of the alleged disability period. The fact that McClendon's conditions apparently improved before worsening again creates a gap that limits the relevance of later evidence. *See Jones v. Callahan*, 122 F.3d 1148, 1154 (8th Cir. 1997) (for purpose of determining whether new evidence creates material basis for remand, an "implicit requirement is that . . . it not concern later-acquired disabilities or subsequent deterioration of a previously non-disabling condition").

Further, the ALJ found that the evidence of McClendon's worsening mental impairments in late 2008 and 2009 could be attributed to her diagnosis and subsequent treatment for atrial fibrillation. This conclusion is supported by counselor Morgan's letter from April 2009, in which she wrote that McClendon attributed her declining mental functioning to her cardiovascular treatment beginning in November 2008. None of the evidence after the alleged disability period demonstrates that McClendon's mental impairments were disabling before her last insured date of December 31, 2007.

## VII.   <u>Conclusion</u>

In sum, though the burden is not "onerous," a claimant must present some evidence in support of her contention that her impairments are severe.  *Kirby*, 500 F.3d at 707.  Once the ALJ discounted testimony from McClendon and her husband, which he did properly, there was no evidence to support a finding that McClendon was suffering from "severe" mental impairments during the alleged disability period.  Therefore, the ALJ's decision to deny benefits was supported by substantial evidence.

Based on the foregoing,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is affirmed.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 15th day of July, 2013.